FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

98 DEC -8 PM 12: 14

U.S. DISTRICT COURT
N.D. OF ALABAMA

COSSANDRA BELL,          }
                         }
    Plaintiff,           }
                         }
v.                       }          CASE NO. CV 97-JEO-1191-NE
                         }
DECATUR GENERAL HOSPITAL }
and ANITA WALDEN,        }          ENTERED
                         }                 ᴅᴜᴍ
    Defendants.          }          DEC 0 9 1998
                         }

## MEMORANDUM OPINION

Before the court is the motion of defendants Decatur General Hospital and Anita

Walden for summary judgment.  Upon consideration of the record, the submissions of the

parties and the relevant law, the court is of the opinion that the defendants' motion is due to be

granted.

Plaintiff Cossandra McWilliams Bell[1] claims that her former employer, defendant

Decatur General Hospital ("DGH"), unlawfully discriminated against her and constructively

discharged her on the basis of her gender (due to pregnancy) and her disability (chronic

spherocytosis) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §§ 2000e, et seq. ("Title VII") and the Americans With Disabilities Act of 1990, 42

U.S.C. §§ 12111, et seq. ("ADA").  She also alleges that DGH illegally retaliated against her

---

[1]The plaintiff's name was Cossandra McWilliams when she began working at DGH.
During her employment there, she married and took her current surname.

after it received a letter from her lawyer complaining of alleged illegal discrimination against her. The plaintiff also brings state law outrage and invasion of privacy claims against defendants DGH and Anita Walden ("Walden"). The plaintiff seeks declaratory and injunctive relief, as well as monetary damages.

## FACTUAL SUMMARY

The plaintiff suffers from spherocytosis, a blood disorder in which the body manufactures sphere-shaped blood cells, often leading to anemia. (Plaintiff's Deposition at 51-52, 61-63). The plaintiff's spleen was removed when she was a child to counteract the effects of the disease, thereby increasing her vulnerability to infections and the time required for her to recover from them. (Id. at 51, 61-63, 116).

The plaintiff started working at DGH in February 1993. (Plaintiff's Deposition at 46, 58). When DGH hired her, the plaintiff did not indicate on her post-offer/preplacement health history and inventory form that she had a physical impairment. (Plaintiff's Deposition at 52-53, Ex. 2).[2] The plaintiff's impairment did not affect her ability to work until fall 1994, when she fell ill with a sinus infection that lasted until spring 1995. (Plaintiff's Deposition at 29, 52-53, 64). Consequently, she missed five days of work. (Plaintiff's Responsive Submission in Response to Motion for Summary Judgment at 13, Ex. 7).

---

[2]Exhibits to the plaintiff's deposition are attached to the copy of the plaintiff's deposition included in the Defendants' Evidentiary Submission in Support of Their Motion for Summary Judgment.

2

Under DGH's absentee policy, in any rolling twelve-month period, an employee with six occurrences[3] receives a warning; at eight occurrences, the employee receives a second warning; at nine occurrences, the employee is placed on a 90-day probationary period. (Absentee Policy).[4]   An occurrence in the probationary period results in a three-day suspension.  (Id.).

The plaintiff was counseled, warned and disciplined for recurring attendance problems during her employment at DGH. (Plaintiff's Deposition at 88,  93-94, 110-11, 138-39, 144, 147-50, 252-57, 261-62, 281). Walden issued eight-occurrence warnings to the plaintiff on April 24, 1995, and August 31, 1995. (Id. at Ex. 35). On September 18, 1995, she issued the plaintiff a nine-occurrence warning, suspended her for three days without pay and put her on a 90-day probation.[5]  (Plaintiff's Deposition at 148-50, Ex. 38, 39). Despite this, the plaintiff's

---

[3]An occurrence consists of an absence or three "tardies." A "tardy" is an instance in which an employee clocks in eight minutes after the hour they were supposed to be clocked in. (Absentee Policy; Jones Deposition at 51).

[4]Attached as Exhibit 8 to the Plaintiff's Responsive Submission in Response to Motion for Summary Judgment.

[5] The plaintiff now points out that her suspension and probation were inconsistent with DGH's absentee policy. The plaintiff argues that Walden violated the policy by suspending her upon her ninth "occurrence" on September 18, 1995 and by improperly counting as "tardies" instances when she clocked in one or two minutes past her scheduled shift. (See September 18, 1995 Absentee Warning - tardies occurring at 7:01, 7:02 and 19:01). The defendants note, however, the plaintiff's shift started at fifteen minutes before the hour. (Defendant's Evidentiary Submission in Support of their Reply to Opponent's Responsive Submission at Ex. C). The defendants also point out that the plaintiff actually could have been on probation earlier than September 1995 because Walden had not counted several "sick child" absences and excessive tardies against the plaintiff in the preceding twelve months. The court notes that, if the suspension was a violation of DGH policy, the plaintiff never complained about it at the time and later testified that it was "fair by the book." (Plaintiff's Deposition at 150-51, Ex. 39). There is no evidence that, at the time, any party thought the September 1995

3

1994-95 evaluation reflects that she met performance standards, resulting in a 4.5% raise in March of 1995.  (Id. at 127-28, Ex. 32; Defendant DGH's Mandatory Disclosures - Bates stamped doc. 00163).

The plaintiff told Walden that her absences from fall 1994 to spring 1995 were due to a prolonged infection, the length of which might be attributable to her lack of a spleen.[6] (Plaintiff's Deposition at 116, 299).  Walden counted these absences as occurrences and they formed, in part, the basis for the plaintiff's suspension in September 1995.  The plaintiff perceived that, during her infection-related absences, Walden's demeanor toward her became unprofessional and derogatory.  (Plaintiff's Deposition at 90-91).

In December 1995, soon after the plaintiff notified DGH of her pregnancy, her superiors began to criticize her job performance, particularly her charting.  (Plaintiff's Deposition at 216; Plaintiff's Responsive Submission in Response to Motion for Summary Judgment at 5).  Three charge nurses[7] noted the plaintiff's failure to follow DGH's charting regimen.[8]  (Plaintiff's Deposition at Ex. 47).  On December 21, 1995, charge nurse Bryan

---

suspension was inconsistent with DGH policy.

[6]The plaintiff presents no medical evidence that her splenectomy possibly contributed to the length of her sinus infection, but for the purposes of this opinion, the court will assume that to have been the case.

[7]The plaintiff's immediate supervisor was the charge nurse for the particular shift she was working.  The charge nurse reported to Walden, who, in turn, reported to Lorraine McCormick, Assistant Vice President for Special Care in Nursing.  McCormick reported to Deborah Lee, Vice President of Nursing.  (Plaintiff's Deposition at 22, 56-57; Walden Deposition at 34, 36; Jones Deposition at 22-23).

[8]DGH nurses use "Problem, Intervention and Evaluation," or "PIE" charting procedures.  This charting method requires a nurse to assess and document specific patient problems, to make diagnoses and to intervene appropriately, and to then evaluate whether the

4

Vest noted that the plaintiff and another nurse, Juanita Goings, had failed to follow PIE charting procedures on a patient's chart over a two day period.[9] (Plaintiff's Deposition at Ex. 47; Walden Deposition at 99-101). He recommended that the plaintiff and Goings be given verbal counseling as well as an orientation and education on PIE charting. (Plaintiff's Deposition at Ex. 47). Charge nurse Melissa Flowers then noted that the plaintiff had made another charting error on December 22, 1995, for which she was counseled by charge nurse Allyson Beverly. (*Id.*). On March 11, 1996, Beverly again counseled the plaintiff after she made another charting error. (*Id.* at Ex. 54). On March 19, 1996, the plaintiff received an employee warning notice for five charting errors. (*Id.* at Ex. 56). The notice stated that it would be forwarded to her personnel file and that, for four weeks, her charts would be monitored for compliance with PIE charting procedures. (*Id.*). As per DGH's normal procedures, the plaintiff's superiors called a Special Care Educator to work with her on charting. (Walden Deposition at 97-98, 101; Plaintiff's Deposition at 178-79, Exs. 47, 49). They also noted that her charts would be monitored for errors. (Plaintiff's Deposition at Exs. 49, 56). While counseling the plaintiff about her charting problems, Walden made comments such as "your pregnancy is no excuse [for performance problems]," "[there's] always something wrong with you," and "I'm going to fire you the next time I see you." (Plaintiff's Deposition at 11-12, 208, 239).

---

intervention was effective and whether the problem continues to exist. (Plaintiff's Deposition at 175; Walden Declaration).

[9]Although the signature at the bottom of Exhibit 47 to the Plaintiff's Deposition is not legible, the defendants state that the signature is that of Bryan Vest, which is not disputed by the plaintiff. (Defendant's Reply Brief at 5).

In late December 1995, the plaintiff received her second suspension for absenteeism, which, like her September 1995 suspension, was based in part upon absences she had incurred during her prolonged infection from fall 1994 to spring 1995. (Plaintiff's Deposition at Ex. 38). At around the same time, Lorraine McCormick, DGH's Assistant Vice President for Special Care in Nursing, observed the plaintiff talking excessively about her pregnancy during work. (McCormick Deposition at 19). At McCormick's instruction, Charge Nurse Melissa Flowers counseled the plaintiff about this issue on January 4, 1996. (Id.). McCormick later observed the plaintiff engaged in the same behavior and instructed Walden to counsel her about it. (Id. at 19-20). On January 16, 1996, Walden counseled the plaintiff about this issue and about her other job-related problems. (Walden Deposition at 112-20, Ex. 18). During this session, Walden stated that "I'm no doctor, but there's something mentally wrong with you. You're mentally ill." (Plaintiff's Deposition at 13). Walden also instructed the plaintiff to undergo counseling in DGH's Employee Assistance Program ("EAP"). (Id. at 13-14). The plaintiff perceived that, when she tried to discuss her possible pregnancy complications with Walden and Flowers, that their attitude changed toward her. (Plaintiff's Deposition at 209).

The plaintiff retained a lawyer who sent a letter dated January 22, 1996 to DGH threatening legal action for alleged illegal discrimination. (Plaintiff's Deposition at 258, Attorney Letter[10]). Afterward, the plaintiff's superiors counseled her repeatedly about her charting problems. (Plaintiff's Deposition at 235, 239, 258). In spite of these problems, the

---

[10]Attached as Exhibit 12 to the Opponent's Responsive Submission in Response to Motion for Summary Judgment.

6

plaintiff's 1995-96 evaluation score was in the range of "Meets Performance," and she received a 3% salary increase. (Plaintiff's Deposition at 217, Ex. 52; DGH Mandatory Disclosures - Bates stamped doc. 00226[11]).

The plaintiff's final counseling before her maternity leave included Lee, McCormick, Walden and Flowers. (Plaintiff's Deposition at 233-38). They talked to the plaintiff about her charting and attendance problems. (Id.). The plaintiff felt threatened in the meeting and feared that her job was in danger. (Id. at 239). She had contractions afterward and went on maternity leave the following weekend due to pre-term labor. (Id. at 231-233, 242).

The plaintiff's medical leave started on April 7, 1996. (Plaintiff's Deposition at 26, 231). After exhausting the 90-day medical leave granted to her under DGH policy, she took an extended leave of absence, during which DGH notified her that she had been laid off and placed on preferred call-back status. (Id. at 242-48, Ex. 57-58, 62). DGH asserts that the plaintiff's lay-off was part of a hospital-wide effort to reduce the number of "full time equivalents" or "FTE's" per occupied bed in order to comply with covenants contained in its bond financing. (Jones Deposition at 77-82). As a part of this effort, Deborah Lee instructed McCormick to take several steps, including not filling the position that had been "vacated" by the plaintiff when she took an extended leave of absence. (Jones Deposition at 84, 95; Walden Depostion at 58-62; McCormick Declaration at Ex. A). She also instructed McCormick to put the plaintiff on a preferential call-back list for six months. (McCormick Declaration at Ex. A). Three other employees at DGH who were on extended leaves of

---

[11]Attached as Ex. L to Defendants' Evidentiary Submission in Support of Their Motion for Summary Judgment.

7

absence for medical reasons were also laid off subject to preferential recall. (Jones Deposition at 97-99). Two of these three employees were on medical leave for reasons unrelated to maternity. (Jones Declaration).

The plaintiff returned to work in DGH's 3-North Unit in mid-September 1996 under the supervision of Nurse Manager Gina Briscoe. (Plaintiff's Deposition at 250-52). In June 1997, the plaintiff requested to go on "PRN" status, which she did shortly thereafter.[12] (Id. at 262-64). DGH contends that she is still on PRN status, although the plaintiff believes that, as she has not been called to work for some time, that she is not on active PRN status. (Plaintiff's Deposition at 218-19).

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); see Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

---

[12]Nurses on "PRN" status have no scheduled hours, but simply work, where possible, when they are called upon by the employer. (Plaintiff's Deposition at 40).

8

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23; see FED. R. CIV. P. 56(a) and (b).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" Celotex, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. Id.

After a properly made motion has been properly responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a

9

verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 259; see Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### A.    Pregnancy Discrimination Claim

The plaintiff claims that DGH discriminated against her on the basis of her gender in the terms, conditions and privileges of her employment during and as a result of her

10

pregnancy. She complains that she was repeatedly counseled for charting errors and for discussing her pregnancy while she was at work, that Walden required her to undergo counseling through DGH's Employee Assistance Program while she was pregnant and that DGH temporarily laid her off in the summer of 1996 while she was on maternity leave.

Section 703 of Title VII provides that "[i]t shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1981). This provision was amended by the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k), in which Congress provided that discrimination "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." See Int'l. Union v. Johnson Controls, 499 U.S. 187, 198-99, 111 S. Ct. 1196, 113 L. Ed. 2d 158 (1991). "The analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994) (citing Maddox v. Grandview Care Center, Inc., 780 F.2d 987, 989 (11th Cir. 1986)).

In a Title VII discrimination case such as this, where the claims are premised upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination.[13]  McDonnell Douglas Corp. v. Green, 411 U.S. 792,

---

[13]The plaintiff claims that she has presented direct evidence of pregnancy discrimination by showing that she was instructed not to discuss her pregnancy at work, that Walden said that

11

802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); Texas Department of Community

Affairs v. Burdine, 450 U.S. 248, 253-54 & n.6, 101 S. Ct. 1089, 1094 & n.6, 67 L. Ed. 2d

207 & n.6; Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997), cert.

denied, --- U.S. ----, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997). Once the plaintiff establishes

a prima facie case, a legal presumption of unlawful discrimination arises and the burden shifts

to the defendant employer to articulate a legitimate, nondiscriminatory reason for the

challenged employment action. McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at

254; Combs, 106 F.3d at 1528. "To satisfy that burden of production, '[t]he defendant need

not persuade the court that it was actually motivated by the proffered reasons. It is sufficient

if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against

the plaintiff.'" Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 254-55, 101 S. Ct. at

1094).

Once the employer meets its burden of production, "[t]he presumption, having fulfilled

its role of forcing the defendant to come forward with some response, simply drops out of the

picture," St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749,

125 L. Ed. 2d 407 (1993); see also Burdine, 450 U.S. at 255 & n.10, leaving the elements of

the prima facie case. Combs, 106 F.3d at 1528. When those elements are accompanied by

evidence of pretext or disbelief of the defendant's proffered explanation, they may permit, in

_____

"there's something wrong with you. You're mentally ill" and "your pregnancy is no excuse
[for performance problems]" and that Walden required her to attend counseling through the
EAP. The court disagrees. None of this evidence constitutes "only the most blatant remarks,
whose intent could be nothing other than to discriminate." Early v. Champion Int'l Co., 907
F.2d 1077, 1082 (11th Cir. 1990)(quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th
Cir. 1989)).

some instances, a finding for the plaintiff. Id. at 1529; see also Hicks, 509 U.S. at 511,

Evans, 131 F.3d at 963. The plaintiff, however, always retains the ultimate burden of proving

that he was the victim of intentional discrimination. Hicks, 509 U.S. at 508; Burdine, 450

U.S. at 253.

**1.      The plaintiff failed to establish a prima facie case of pregnancy discrimination with respect to defendant's actions before her layoff.**

To establish a prima facie case under the PDA, the plaintiff must show that: (1) she is

a member of a group protected by Title VII; (2) she was qualified for the position; (3) she

suffered an adverse effect on her employment; and (4) she suffered from differential

application of work or disciplinary rules. Armstrong v. Flowers Hospital, Inc., 33 F.3d 1308,

1314 (11th Cir. 1994).

The plaintiff's PDA claims are based in part upon certain acts of DGH that occurred

before her temporary layoff. These claims fail because the plaintiff has not offered evidence

that she suffered from a differential application of work or disciplinary rules than did non-

pregnant employees. Although she complains that she was given two post-op patients and that

Flowers asked some of her patients if they were satisfied with their nurse, she admits that she

does not know whether or how often other nurses were so treated. (Plaintiff's Deposition at

177-78, 211-13). She complains that she received a three-bed assignment, but admitted that

she was not the only nurse to do so. (Id. at 210-11). Although she complains that she took

patients with communicable diseases during her pregnancy, another pregnant nurse did not.

(Id. at 297). The plaintiff complains that she was counseled repeatedly and given special

training for charting errors, but she presents no evidence that non-pregnant nurses were not

13

given special training or counseled for similar errors found in their charting.[14]  On the

contrary, the evidence shows that other nurses were counseled about charting problems and

that it was normal procedure to offer special training to nurses with charting problems.

(Walden Deposition at 18, 96-98; Plaintiff's Deposition, Ex. 47).

The plaintiff complains that she was twice instructed, first by Flowers and then by

Walden, not to discuss her pregnancy at work.[15]  There is no evidence, however, that non-

pregnant nurses who similarly disrupted the work environment and distracted their colleagues

by discussing personal matters at work were treated differently than was the plaintiff.

The plaintiff argues that Walden discriminated against her on the basis of her

pregnancy by forcing her to undergo counseling through the Employee Assistance Program

("EAP").  Although the evidence reflects that this was a violation of DGH's policy regarding

required EAP participation, there is no evidence that Walden treated the plaintiff differently

from non-pregnant employees who she perceived were distracted from their duties by personal

problems.  Walden testified that she has "suggested" participation in the EAP to other

employees, just as she did to the plaintiff, and has twice participated in it herself. (Walden

Deposition at 122-23).  There is no evidence that all or any of these other people were

---

[14]The plaintiff argues that, although she never changed her charting practices, she began to receive criticism about her charting after she became pregnant.  In so arguing, the plaintiff implies that she did not make charting errors serious enough to warrant counseling. The plaintiff presents no evidence that she did not make charting errors or that non-pregnant nurses were treated differently when their charge nurses noted similar errors in their charting. She merely makes vague assertions that other unidentified nurses made similar charting errors.

[15]The defendants allege that the plaintiff was only instructed to limit the discussions about her pregnancy while she was at work.

14

pregnant when Walden "suggested" the EAP to them. As there is no evidence that the plaintiff

was subjected to a differential application of work or disciplinary rules than were non-pregnant

employees, her PDA claims based upon such a differential application of the rules must fail.

## 2.   The plaintiff failed to prove a prima facie case of pregnancy discrimination with respect to her temporary layoff.

The plaintiff also claims that her temporary layoff in 1996 violated the PDA. This

claim is similar to those in "reduction-in-force" cases brought by plaintiffs who occupied a

position that was eliminated entirely, since the plaintiff's position was eliminated for a few

months. As the Eleventh Circuit has stated in the age discrimination context:

> [the McDonnell Douglas] criteria are altered slightly in both a
> reduction-in-force ("RIF") case and where a position is eliminated in its
> entirety; in these instances, the plaintiff establishes a prima facie case by
> demonstrating (1) that she was in a protected age group and was adversely
> affected by an employment decision, (2) that she was qualified for her current
> position or to assume another position at the time of discharge, and (3) evidence
> by which a fact finder could reasonably conclude that the employer intended to
> discriminate on the basis of age in reaching that decision.

Jameson v. Arrow Co., 75 F.3d 1528, 1531-32 (11th Cir. 1996) (citations omitted).

Adapting these factors to a temporary layoff in the PDA context, it is evident that the

plaintiff cannot establish a prima facie case based upon her temporary layoff because she has

not shown "evidence by which a fact finder could reasonably conclude that the employer

intended to discriminate on the basis of [pregnancy] in reaching [the decision to include her in

the temporary layoff]." Jameson, 75 F.3d at 1532. On the contrary, the evidence shows that

the layoff was effected in keeping with Deborah Lee's plan for the ICU/CCU to meet its goal

of reducing the number of "FTE's" as a part of DGH's effort to comply with the terms of its

15

bond financing.[16] (Jones Deposition at 98; Walden Deposition at 62; Jones Declaration; McCormick Declaration). Among other things, this plan called for employees on extended leave to be laid off subject to preferential recall. (Id.). Plaintiff was among four employees on extended leave that were included in the layoff, and two of those employees were on leave for reasons unrelated to pregnancy. (Jones Declaration). There is no evidence that there was any discriminatory intent behind this plan or its implementation. The plaintiff has thus failed to offer evidence supporting a required element of her prima facie case. Her PDA claim, insofar as it is based upon her temporary layoff, must therefore fail.

### 3. The plaintiff failed to show pretext.

Even assuming that the plaintiff established a prima facie case with respect to the PDA claims, those claims would still fail because DGH has stated legitimate, nondiscriminatory reasons for the actions forming the basis for the plaintiff's PDA claims. The defendants assert that the plaintiff was admonished about discussing her pregnancy at work only to ensure that she was providing quality care to the patients and not distracting the other nurses from their duties. The defendants further assert that the repeated admonishments and counseling given to the plaintiff with respect to her charting errors were necessary for patient safety and care. They point out that three different charge nurses noted problems with the plaintiff's charting, that the plaintiff was not the only nurse counseled about charting errors during that time frame and that charting errors can be fatal to the patient, particularly in the ICU/CCU. In addition,

---

[16] Deborah Lee decided to reduce the level of "FTE's" in the ICU/CCU department by not filling two vacant positions and by laying off all of those on extended leaves of absence, such as the plaintiff, subject to preferred call-back status for six months.

16

the evidence shows that Walden suggested the plaintiff seek EAP counseling not because she

was pregnant but because her job performance had been seriously compromised by her

apparent distraction with personal problems. Also, the defendants assert, as set forth above,

that the plaintiff's layoff was purely driven by budgetary considerations and that she was

recalled to work several weeks later. The plaintiff has failed to show that the asserted

legitimate non-discriminatory reasons offered by the defendants for their actions toward her

are pretextual.[17] Thus, the plaintiff's PDA claims must fail.

## B.    ADA Claim

The plaintiff claims that DGH violated the ADA by discriminating against her on the

basis of her spherocytosis. The ADA prohibits an employer "from discriminating based upon

the known physical or mental impairments of a qualified individual with a disability." 42

U.S.C. § 12112(a). As the Eleventh Circuit recently explained:

> In order to prevail under the ADA, [a plaintiff] must prove all three elements of
> his prima facie case by a preponderance of the evidence. [Footnote omitted.]
> First, he must show that he has a disability. [Footnote omitted.] Second, he
> must demonstrate that he is qualified to serve [in his position], with or without
> some reasonable accommodation by the [employer], despite his disability.
> Third, he must show that he has suffered an adverse employment action because
> of his disability (i.e., that he has suffered employment discrimination). See
> Harris v. H & W Contracting Co., 102 F.3d 516, 519, 523-24 (11th Cir.1996)
> (discussing the elements of a prima facie case under the ADA).

Doe v. DeKalb County School District, 145 F.3d 1441, 1445 (11th Cir. 1998).

---

[17]The counseling, warnings and discipline the plaintiff received under the DGH
absentee policy does not appear to be a basis for the plaintiff's PDA claims. The court notes,
however, that DGH has presented legitimate, non-discriminatory reasons for its actions in this
regard. It assets that it was merely enforcing a neutral policy of progressive discipline for all
absences other than those encompassed by a few narrow exceptions. There is no indication
that this stated reason is a pretext for illegal discrimination.

### 1.     The plaintiff's ADA claims are timely.

The defendants assert that the plaintiff's ADA claim is untimely, arguing that the last

alleged discriminatory act giving rise to the claim happened more than 180 days before she

filed her EEOC charge on August 8, 1996.[18]   The absences the plaintiff attributes to her

alleged disability occurred from fall 1994 through spring 1995.  Those absences, combined

with other absences, resulted in the plaintiff's suspension in September and December of 1995,

more than 180 days before the plaintiff filed her EEOC charge.  The defendants thus argue

that the claims based upon these suspensions are untimely under 42 U.S.C. § 12117(a).  The

plaintiff stated in her EEOC Charge, however, that she was "[o]n a continuous basis . . .

subjected to harassment and disciplinary actions."  (Defendant's Evidentiary Submission in

Support of Their Reply to Opponent's Responsive Submission at Exhibit A).

The primary actions arising out of the plaintiff's alleged disability-related absences

were her suspensions in September and December of 1995, more than 180 days before she

filed her EEOC Charge.  Yet, she also argues that, as a result of her disability, her superiors

counseled, warned and reprimanded her from that time up until she took maternity leave

several months later.  She has thus arguably stated a "continuing violation" theory of ADA

violations by the defendants that brings her claims within the 180-day requirement.  The

plaintiff's allegation that her temporary layoff in the summer of 1996 violated the ADA would

---

[18]The ADA incorporates Title VII's enforcement procedures, including that codified at
42 U.S.C. § 2000e-5(e), which requires that a charge of discrimination be filed with the
EEOC within 180 days from the date of the alleged unlawful employment practice.  42 U.S.C.
§ 12117(a).

18

clearly fall within the 180-day requirement, as she filed her EEOC Charge just shortly after the temporary layoff. [19]

## 2. The plaintiff's impairment is not a "disability" under the ADA.

The defendants argue that the plaintiff is not "a qualified individual with a disability" because, for the purposes of the ADA, her impairment is not a disability. The plaintiff's ADA claim is based upon her absences in late 1994 and early 1995, which were caused by her prolonged sinus infection. The length of the infection may have been related to the plaintiff's splenectomy, which was necessitated by her spherocytosis. (Plaintiff's Deposition at 64, 90, 285). The defendants argue that infections such as the plaintiff's sinus infection are not disabilities within the meaning of the ADA because they are temporary in nature and do not "substantially limit a major life activity." (EEOC Technical Assistance Manual, § 2.2(a)(iii)). As one court noted,

The EEOC in its Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, 29 C.F.R. § 1630.2(j) states, "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." Examples are broken limbs, concussions, infections, and the like. Id. However, if such a condition is a symptom or result of a longer-lasting underlying condition and continually reappears in such a way as to limit one or more major life activity, then the underlying condition would be a disability. Id. The factors to be considered in determining whether an impairment substantially limits an individual in one or more life activity are: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the actual or expected long term impact resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

_____

[19]The plaintiff claims that her alleged disability led to her effective termination. Although the court assumes that the plaintiff is referring to her temporary layoff, it notes that she continued as a DGH employee for at least nine months after her recall.

Wallace v. Trumbull Memorial Hospital, 970 F. Supp. 618, 620-21 (N.D. Ohio 1997).[20] See also Red Mendoza v. Borden, Inc., 158 F.3d 1171, 1174 (11th Cir. 1998) (citing 29 C.F.R. 1630(j)(2)) .

The plaintiff's infections themselves would normally be considered "temporary, non-chronic impairments of short-duration, with little or no long term or permanent impact." 29 C.F.R. § 1630.2(j).  Yet, it is conceivable that, if she had recurring, persistent infections because of her spherocytosis and her resulting splenectomy, she could have a "disability" under the ADA.  See Wallace, 970 F. Supp. at 620.  An examination of the three factors set forth in 29 C.F.R. § 1630.2(j)(2) demonstrates, however, that the plaintiff does not have a disability under the ADA.

The "duration or expected duration" of the plaintiff's spherocytosis and the resulting splenectomy is permanent, but the "actual or expected long term impact resulting from the impairment" is uncertain.  29 C.F.R. § 1630.2(j)(2).  The plaintiff states that she will always have difficulty fighting infections because she lacks a spleen and points to her long sinus infection in fall 1994 and spring 1995 as evidence.  Yet, there is no evidence that she has infections that "continually reappear[ ] in such a way as to limit one or more major life activity."  Wallace, 970 F. Supp. at 620.  On the contrary, the evidence indicates that, before the infection at issue here, the plaintiff did not have persistent infections that prevented her

---

[20]The "symptom or result of a longer-lasting underlying condition" language appears to be the Wallace court's interpretation of provisions in the EEOC's Interpretive Guidance on 29 C.F.R. § 1630.2(j)(2) rather than a quote or direct paraphrase of those provisions.  See 29 C.F.R. § 1630 - Appendix at section addressing 29 C.F.R. § 1630.2.  The interpretation is a reasonable one with which this court agrees.  See also Soodman v. Wildman, Harold, et al., 1997 WL 106257, *6 (N.D. Ill. 1997).

from attending her job or from engaging in major life activities. She did not bother to mention her condition at all on her post-offer/preplacement health history and inventory form she filled out for DGH.[21] Even during the four-month period in which the plaintiff suffered from a sinus infection, she missed only five days of work. The evidence shows that, since then, the plaintiff has not suffered recurring, prolonged infections although she did suffer from borderline pneumonia on one occasion and a high white blood cell count (for reasons that were not clear in the record) on another. (Plaintiff's Deposition at 66-67). From this standpoint, the "nature and severity of the impairment" do not appear to be especially significant. 29 C.F.R. § 1630.2(j)(2). The mere possibility that the plaintiff could suffer from lingering infections in the future which could potentially limit her from engaging in major life activities is not enough to show she has a disability under the ADA.

Under the EEOC regulations, it thus appears that the plaintiff's impairment is not a "disability" within the meaning of the ADA. Her ADA claims premised on her impairment must therefore fail.

### 3. The plaintiff's employer did not regard her as having a disability.

The plaintiff next argues that, regardless of whether her impairment is actually a disability, she still has a disability within the meaning of the ADA because the defendants regarded her as having a mental disability. As evidence, she points to the Walden's statement

---

[21]The plaintiff does, however, state that she discussed her spherocytosis with Pat Hill, who was the ICU/CCU nurse manager at the time the plaintiff was hired as a nursing assistant. (Plaintiff's Deposition at 48-50).

that "there's something mentally wrong with you. You're mentally ill." As further evidence,
she also asserts that Walden required her to seek emotional counseling through the EAP.

The ADA defines disability as: "(A) a physical or mental impairment that substantially
limits one or more of the major life activities of such individual; (B) a record of such an
impairment; or (C) being regarded as having such impairment." 42 U.S.C. § 12102(2).
Thus, if the plaintiff's employer regarded her as having an impairment that substantially limits
one or more of her major life activities, she is "disabled" under the ADA.

The EEOC regulations define one who is "regarded as having such an impairment
[constituting a disability]" as an individual who (1) has a physical or mental impairment that
does not substantially limit major life activities but is treated by her employer as constituting
such limitation; (2) has a physical or mental impairment that substantially limits major life
activities only as a result of the attitudes of others toward such impairment; or (3) has no
illness or malady defined by the EEOC as a physical or mental impairment but is treated by
her employer as having a substantially limiting impairment. 29 C.F.R. § 1630.2(1). The
plaintiff apparently alleges that she falls within the first or third categories.

The evidence shows that, to the extent Walden thought the plaintiff might have an
impairment, she did not regard it as the sort of impairment that would substantially limit major
life activities. Walden acknowledged that she thought the plaintiff's personal problems were
causing her to have emotional difficulties and were affecting her job performance. She noted
that, in addition to the plaintiff's recurrent attendance problems, the plaintiff began to err
significantly in her charting of patients' conditions, which is particularly dangerous in the
ICU/CCU. She also noted that the plaintiff had to be counseled on two separate occasions for

22

frequently discussing her pregnancy and its attendant problems while at work. Walden asserts

that she asked the plaintiff to get counseling because of these performance problems and

because she seemed distraught and often talked of her fears about her pregnancy and about the

health of her unborn child. (Deposition of Walden at 26-29).

The evidence shows that, in spite of these distractions and personal problems the

plaintiff was experiencing, Walden thought she could and should perform all the duties of her

job. In fact, on her evaluation during the time at issue, the plaintiff was judged as meeting

performance and was given a raise in pay. Flowers wrote on the plaintiff's January 26, 1996

evaluation that

> Cossandra Bell demonstrates excellent nursing skills and has the potential to be
> an excellent critical care nurse. She has recently had tremendous personal
> obligations that seem to have influenced certain aspects of her nursing care i.e.,
> charting, tardiness and inappropriate communication of personal affairs with co-
> workers and ancillary departments. Cossandra is very intelligent and possesses
> the capability to perform excellent [sic] in all areas. I would love to see her
> grow in the areas that currently need improvement and maintain the consistent
> excellent contributions in other areas. Cossandra's greatest strength is her
> flexibility and willingness to help others. She will freely volunteer for a pull or
> volunteer to take an admission. She has never complained about an assignment.

(Plaintiff's Deposition at Ex. 52, Bates stamped doc. 220). On the same evaluation, Walden

noted[22] as follows:

> Ms. Bell is extremely capable as a critical care nurse. She is flexible and
> helpful to her co-workers. She has continued to have an absenteeism problem
> throughout the year and over the past several months has been counceled [sic]

---

[22]Although the comment is unsigned, it appears to be that of Walden. The author
"concurs" with the comments of the charge nurses, who are Walden's immediate subordinates
and the plaintiff's immediate superiors. Also, the word "counseled" is misspelled in the same
way that Walden misspells it in certain of her notes, which are featured in another record
exhibit. (See Walden Deposition at Ex. 18).

by her charge nurse for various problems with staff, [patients], [patients']
families, physicians and other dept. personnel. Her focus, as well as all staff,
must remain on the patients and their well-being. The charge nurses agree that
Ms. Bell is an excellent clinician and I concur.

(Plaintiff's Deposition at Ex. 52, Bates stamped doc. 221). The evidence reflects that the

plaintiff's superiors believed her to be fully capable of doing her job well, but that she had

allowed her personal problems to distract her from doing so. Their comments indicate that

they considered her quite able to overcome her personal problems and improve her job

performance. Thus, even if Walden told the plaintiff she was mentally ill, this does not show

that she or the plaintiff's other superiors regarded the plaintiff as being substantially limited

from engaging in major life activities or from performing her duties. The evidence indicates

otherwise.

Likewise, Walden's instruction that the plaintiff get counseling through the EAP does

not prove that Walden regarded her as disabled. If an employer sends an employee for a

psychological evaluation, that does not necessarily mean that he or she regards the employee

as disabled. In one case, where one of the plaintiff's co-workers complained that she was

acting erratically and was carrying a gun, the defendant offered the employee paid medical

leave and required that she see a psychologist before returning to work. When the employee

later complained that the employer regarded her as disabled, the court stated as follows:

[a]n employer's request for a mental evaluation is not inappropriate if it is not
obvious that an employee suffers from a disability. A request for an evaluation
is not equivalent to treatment of the employee as though she were substantially
impaired. See Miller v. Nat'l Cas. Co., 61 F.3d 627, 630 (8th Cir. 1995)
(quoting 29 C.F.R. app. § 1630.9). Employers need to be able to use
reasonable means to ascertain the cause of troubling behavior without exposing
themselves to ADA claims under §§ 12112(a) and 12102(2)(C). See Johnson v.
Boardman Petroleum, 923 F. Supp. 1563, 1568 (S.D. Ga. 1996) (offer of a

24

leave of absence showed concern for employee's well being, not treatment of
the employee as disabled).

Cody v. Cigna Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998).

In Kvintus v. R.L. Polk & Co., 3 F. Supp. 2d 788 (E.D. Mich. 1998), co-workers
described the plaintiff as "disorganized," "delusional" and "confrontational." The employer
contacted an industrial psychologist about him and ultimately offered him a paid leave of
absence. The plaintiff's position at the company was eliminated while he was on leave, and he
filed an action under the ADA for disability discrimination. The plaintiff argued that her
employer's perception of disability should be inferred from its offer to plaintiff of a paid
medical disability leave. The district court declined to make that inference. "To hold otherwise
would unnecessarily inhibit employers from any inquiry regarding the status of behavior on the
part of an employee that an employer may perceive as inappropriate for the employment
environment." Id. at 796. See also Sullivan v. River Valley School District, 20 F. Supp. 2d
1120, 1998 WL 598391, *4 (W.D. Mich., September 8, 1998) ("It is clear from the
preceding authorities that Defendants' concern for Plaintiff's mental condition and their
request for further inquiry into Plaintiff's mental condition, are not a sufficient basis from
which to infer that they perceived Plaintiff as disabled. Defendants needed to ascertain the
cause of Plaintiff's troubling behavior.)   See also Walton v. City of Manassas, --- F.3d --,
1998 WL 545895, *2 at note (4th Cir., Aug. 14, 1998) (table, text in Westlaw) ("To the
extent that Walton contends that requiring him to attend EAP as a condition of keeping his
employment violated the ADA, such conditioning is not itself a violation of the ADA.").

25

Thus, even if Walden required the plaintiff to seek counseling through the EAP in order to keep her job, this would not show that Walden considered her to be disabled. As is stated above, the evidence indicates that Walden considered the plaintiff as capable of doing her job. As the evidence does not show that the plaintiff's employer regarded her as suffering from a disability, her ADA claims based upon any such perceived disability must fail.

### 4.      The defendants did not have adequate notice of the alleged disability.

The defendants argue that they did not have adequate notice of a disability. They argue that, when the plaintiff was absent with her infection, she only gave vague indications as to how her illness was related to her spherocytosis or her splenectomy. The plaintiff states that she "kept [Walden] updated on that there was obviously a chronic problem," and told Walden "they thought there might be a problem with it being me not having a spleen and not able to get better." (Plaintiff's Deposition at 116). There is no evidence that the plaintiff ever presented to the defendants any statement from a physician confirming that she had an impairment or explaining her impairment. The plaintiff's own statements connecting her absences with her impairments were quite vague and indefinite, and were therefore insufficient to have put the defendants on notice of her alleged disability. See Morisky v. Broward County, 80 F.3d 445, 448 (11th Cir.1996) ("[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA."). See also Huppenbauer v. May Department Stores, Co., 99 F.3d 1130 (table), 1996 WL 607087, *6 (4th Cir. October 23, 1996); Lancaster v. City of Mobile, 1996 WL 741371, *3 (S.D. Ala. August 14, 1996), aff'd, 110 F.3d 798 (11th Cir. 1997). Her ADA claims fail for this reason, as well.

26

**5.    The evidence does not show that the defendants discriminated against the plaintiff on the basis of her alleged disability.**

To prevail under the ADA, the plaintiff must show "that [she] has suffered an adverse employment action because of [her] disability (i.e., that [she] has sufffered employment discrimination." Doe v. DeKalb School District, 145 F.3d 1441, 1445 (11th Cir. 1998). "[T]he 'ADA encompasses two distinct types of discrimination': 'treating a "qualified individual with a disability" differently because of the disability, i.e. disparate treatment' and 'failing to provide a reasonable accommodation.'" L.C. by Zimring v. Olmstead, 138 F.3d 893, 899 (11th Cir. 1998) (citing Sieberns v. Wal-Mart Stores, Inc., 125 F.3d 1019, 1021-22 (7th Cir.1997), petition for cert. filed, 67 U.S.L.W. 3259, Sept. 29, 1998). The plaintiff makes ADA claims based upon both types of discrimination.

### a.    Disparate Treatment

The plaintiff presents circumstantial evidence of intentional discrimination, arguing that she suffered disparate treatment on the basis of her alleged disability.[23]  Several federal circuit courts of appeal have used the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and subsequent cases to analyze ADA claims supported by circumstantial evidence. See Hartog v. Wasatch Academy, 129 F.3d 1076, 1085 (10th Cir. 1997); Price v. S-B Power Tool, 75 F.3d 362 (8th Cir. 1996), cert. denied, --- U. S.---, 117 S. Ct. 274 (1996); Daigle v. Liberty Life Ins. Co., 70 F.3d 394 (5th Cir. 1995); DeLuca v.

---

[23]The evidence supporting plaintiff's ADA claims is circumstantial, as it does not constitute the sort of evidence, which, if believed, would prove discriminatory intent without inference or presumption. Earley v. Champion Internat'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).

Winer Indus., Inc., 53 F.3d 793 (7th Cir. 1995); Ennis v. National Ass'n of Business & Educ.

Radio, Inc., 53 F.3d 55 (4th Cir. 1995).

In adapting the McDonnell Douglas standard to the ADA context, the Price court stated

as follows:

> To establish a prima facie case under the ADA, a plaintiff must show that she is
> a disabled person within the meaning of the ADA, that she is qualified to
> perform the essential functions of the job (either with or without reasonable
> accommodation), and that she has suffered an adverse employment action under
> circumstances from which an inference of unlawful discrimination arises.
> Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995);
> Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995); Johnson v.
> Legal Services of Arkansas, Inc., 813 F.2d 893, 896 (8th Cir. 1987)
> (Rehabilitation Act of 1973). An inference of discrimination may be raised by
> evidence that a plaintiff was replaced by or treated less favorably than similarly
> situated employees who are not in the plaintiff's protected class. [Footnote
> omitted]. Johnson, 813 F.2d at 896.

Price, 75 F.3d at 365.

Under this formulation of the McDonnell Douglas standard, even if the court assumes

that the plaintiff had a disability, her claim must fail because the evidence does not reflect that

the complained-of acts occurred under such circumstances that would raise an inference of

disability-related discrimination.[24]

### i. Counseling, warnings and discipline received by the plaintiff because of her absences.

The plaintiff complains that she was counseled, warned and disciplined for

absenteeism. The plaintiff has not presented facts tending to suggest that she was counseled,

---

[24]The court also notes that DGH has offered legitimate, non-discriminatory reasons for
the complained-of actions in this case, as is set forth in the Title VII pretext discussion above.
There is no indication that these asserted reasons are pretexts for illegal discrimination.

warned or disciplined for absenteeism because of any alleged disability, or that non-disabled
employees were treated differently under the absentee policy. There is no evidence showing
that there were non-disabled employees with attendance problems similar to those of the
plaintiff. It is thus impossible to determine whether any such non-disabled employees were
treated differently for their violations of the absentee policy. The evidence instead reflects that
DGH applied a neutral absentee policy of progressive discipline on the plaintiff, which
resulted in her two suspensions. The evidence reflects that this absentee policy applies even
where absences are due to illness or where DGH policy would forbid the employee from
coming to work (as in the case of contagious illness), with a few exceptions. The plaintiff's
ADA claim that she suffered disparate treatment with respect to absenteeism-related
counseling, warning and discipline must therefore fail.

### ii. Counseling and warnings received by the Plaintiff because of her charting errors.

The plaintiff complains that she was counseled and warned about her charting errors
after she became pregnant, at about the same time she was counseled for discussing her
pregnancy and instructed to obtain counseling through the EAP. The evidence does not reflect
that the counseling that the plaintiff received for her charting errors was based upon her
disability or that non-disabled employees who made similar charting errors were treated
differently. Although she makes vague allegations that other nurses made charting errors
similar to hers, there is no evidence pointing to the identity of any non-disabled employees
who made similar charting errors or how the defendants treated them. She therefore cannot
show that non-disabled employees were treated differently with respect to such errors. The

29

plaintiff's ADA claim that she suffered disparate treatment with respect to her charting errors must therefore fail.

### iii.  Requirement that the plaintiff accept counseling through the EAP.

The plaintiff complains that Walden required her to attend counseling through the EAP. The evidence does not show that Walden based this requirement upon the plaintiff's alleged disability. Walden claims that she "suggested" EAP counseling to the plaintiff. She claims that she also "suggested" EAP counseling to several employees other than the plaintiff, but the evidence does not reflect whether the performance problems that led her to do so were similar to those of the plaintiff or whether any of those employees were disabled. There is no evidence as to the existence of any other employees, disabled or non-disabled, whose job performance and attention were similarly affected by personal problems. The evidence thus fails to reflect that the plaintiff was treated differently from non-disabled employees who exhibited similar performance problems. The plaintiff's ADA claim that she suffered disparate treatment with respect to the requirement that she attend EAP counseling must therefore fail.

### iv.  The plaintiff's temporary layoff.

The plaintiff complains that she was temporarily laid off during her maternity leave. The plaintiff has not shown that her temporary layoff was based upon her disability. She has not shown that non-disabled employees who were in similar circumstances were treated differently than she was. The evidence reflects that all other employees on extended medical leave were temporarily laid off. The record does not indicate whether any of the other employees included in the layoff were disabled for the purposes of the ADA. It is thus

30

impossible to determine whether she was treated differently than non-disabled employees for the purposes of the temporary layoff. The plaintiff's ADA claim that she suffered disparate treatment with respect to her temporary layoff must therefore fail.

### b.    Failure to make a reasonable accommodation.

The evidence does not show that the defendants failed to make a reasonable accommodation to the plaintiff for her alleged disability. Specifically, the plaintiff claims that, for the purposes of DGH's absentee policy, the defendants should not have counted against her the absences she incurred during her infection in fall 1994 and spring 1995, which she attributes to her alleged disability. Even assuming that the plaintiff had a disability that caused her to violate DGH's absentee policy, the plaintiff cannot meet her burden of showing a failure to make a reasonable accommodation. The Eleventh Circuit has held that "an ADA plaintiff (1) as part of her burden of production, must identify an accommodation that would allow her to perform her job duties and (2) as part of her burden of proving her case, must establish that such an accommodation is reasonable." Willis v. Conopco, 108 F.3d 282, 283 (11th Cir. 1997). The plaintiff has identified an accommodation–she argues that, for the purposes of the absentee policy, the defendants should disregard any absences she incurs due to her alleged disability, a disability that purportedly causes recurring infections. It appears that such an accommodation would relieve her of her job duties, rather than allowing her to perform them.

DGH has a no-fault absentee policy with few exceptions. The testimony revealed that, even if an employee may not attend work due to the DGH policy concerning infectious diseases, the resulting absence would still be considered for the purposes of the absentee policy. This evidence illustrates that attendance is extremely important for DGH employees

31

and that it is an essential function of the plaintiff's job.  The plaintiff argues that a reasonable

accommodation would be for the defendants to disregard any absences related to her alleged

disability.  The courts have not looked favorably upon such arguments, however.  In Palazzolo

v. Galen Hospitals of Texas, 1997 WL 837951 (N.D. Ga. 1997), the court stated as follows:

> [w]ith rare exceptions, one cannot perform any function, essential or otherwise,
> if one is not present at work.  Many courts, including those of this district and
> the Eleventh Circuit Court of Appeals, have held as a matter of law that
> excessive, sporadic and unpredictable absenteeism or tardiness renders the
> employee an unqualified individual under the ADA or the Rehabilitation Act.
> See Jackson, 22 F.3d at 278 (holding by 11th Circuit Court of Appeals that
> because the plaintiff was often absent on a sporadic, unpredictable basis, he
> could not fulfill an essential function of his employment, that of being present at
> a job site, and therefore, was not otherwise qualified under the Rehabilitation
> Act); Tyndall v. National Educ. Centers, 31 F.3d 209, 213 (4th Cir.1994)
> (holding that employee who cannot meet the attendance requirements of the job
> at issue cannot be considered a qualified individual under the ADA); Mears v.
> Gulfstream Aerospace, 905 F. Supp. 1075, 1080 (S.D. Ga. 1995) (same);
> Walders v. Garrett, 765 F. Supp. 303, 309 (E.D. Va. 1991) (holding that while
> perfect attendance is not a necessary element of all jobs, regular and predictable
> attendance is necessary for many); Santiago v. Temple University, 739 F. Supp.
> 974 (E.D. Pa.1990) (finding the plaintiff unqualified due to sporadic attendance
> at work); Matzo v. Postmaster General, 685 F. Supp. 260 (D.D.C.1987)
> (holding that plaintiff whose attendance at work is unreliable and sporadic failed
> to fulfill essential function of the job); Wimbley v. Bolger, 642 F. Supp. 481,
> 485 (W.D. Tenn. 1986) (holding that one who does not come to work cannot
> perform any of his job functions, essential or otherwise.); Stevens v. Stubbs,
> 576 F. Supp. 1409, 1415 (N.D. Ga. 1983) (stating that the law does not protect
> absenteeism because it renders an employee unable to perform his or her job).
> The Plaintiff admits that he could not perform his duty without being present in
> the kitchen and that when he was absent the Hospital had to assign someone to
> perform his tasks in his place.  Therefore, it was an essential element of the
> Plaintiff's job for him to be at work when scheduled.  The undisputed evidence
> shows that between September 1, 1995, through February 13, 1996, the
> Plaintiff was repeatedly late and often absent altogether.  Therefore, he was
> unable to perform an essential function of his job and was not a qualified
> individual.
>
> Habitual tardiness and absenteeism are not disabilities that require employer
> accommodation.  The Hospital was not required to restructure the closing chef

32

position to accommodate the Plaintiff's erratic work habits. Forcing an
employer to accommodate unpredictable tardiness or absenteeism is
unreasonable even if it is a direct result of the employee's disability. No
employer could effectively do business without a reliable work force. See also,
Gore v. G.T.E. South, 917 F. Supp. 1564, 1572-3 (M.D. Ala. 1996) (holding
that neither ADA nor Rehabilitation Act required employer . . . to attempt to
accommodate an employee's unpredictable absences); Walders v. Garrett, 765
F. Supp. 303, 313 (E.D. Va. 1991) (holding that employer need not
accommodate an employee's absenteeism by allowing employee to work only
when feeling well if it would unacceptably reduce efficiency); Santiago v.
Temple University, 739 F. Supp. 974, 979 (E.D.Pa.1990) (holding that the
unpredictable nature of the plaintiff's disability that caused excessive
absenteeism rendered accommodation unreasonable). Therefore, the Plaintiff
has failed to show that a reasonable accommodation would have compensated
for his sporadic work schedule. The Plaintiff was not a qualified individual and
the Defendant is entitled to summary judgment as to his ADA and
Rehabilitation Act claims.

Palazzolo, 1997 WL 837951 at *3-4.

What the plaintiff suggests, in essence, is that DGH's absentee policy be held in
abeyance for her whenever she has any absences relating to her alleged disability. Viewed in
the light of the discussion set forth above and in the light of common sense, such an
accommodation is not reasonable. Instead of allowing her to perform her duties, it relieves
her of the duty of regular attendance. The plaintiff has not met her burden of identifying an
accommodation that would allow her to perform her duties, including that of attendance.
Neither has she met her burden of establishing that the proposed accommodation is reasonable.
Her ADA claims, insofar as they are based upon any failure to reasonably accommodate her
alleged disability, must therefore fail.

33

## C.     Constructive Discharge Claim

The plaintiff claims that she was constructively discharged in violation of Title VII.

The defendants argue that the plaintiff was not discharged at all because she was never fired

and she never resigned.  As the former Fifth Circuit explained,

> [t]he general rule is that if the employer deliberately makes an employee's
> working conditions so intolerable that the employee is forced into an
> involuntary resignation, then the employer has encompassed a constructive
> discharge and is liable for any illegal conduct involved therein as if it had
> formally discharged the aggrieved employee.

Young v. Southwestern Savings & Loan Ass'n, 509 F.2d 140, 144 (5th Cir.1975) (emphasis

added).  [Footnote omitted].  See also Buckley v. Hosp. Corp. of America, 758 F.2d 1525

(11th Cir.1985).  This general rule has been interpreted to require the plaintiff to leave his or

her job in order to state a cause of action for constructive discharge:

> The imposition of liability against a rogue employer [for constructive discharge]
> is explicitly predicated on a finding the aggrieved employer was "*forced into an
> involuntary resignation.*" [Young, 509 F.2d at 144 (emphasis added)].  Thus, in
> order to establish a prima facie case of constructive discharge the Plaintiff must
> show that he/she has left employment. Rodriguez-Pinto v. Tirado-Delgado, 982
> F.2d 34 (1st Cir.1993) (holding that employee's constructive discharge claim
> failed where he did not leave his employment).

\* \* \*

> Specifically, a successful claim for constructive discharge must contain an
> element of discharge.  In other words, a Plaintiff must leave her employ.  It is
> illogical to find a "reasonable person" could not continue working at the job in
> question, and then find that [the plaintiff] in fact was able to continue working
> for [the defendant] for 10 months after.  In the end, to the extent cases
> concerning the elements for finding constructive discharge have not heretofore
> explicitly stated an essential element to be that Plaintiff must actually leave her
> work--this Court has little difficulty adding that element to an examination of
> these claims.

Joseph v. Publix Super Markets, Inc., 983 F. Supp. 1431, 1439 (S.D. Fla. 1997).

34

In this case, the plaintiff never resigned. She was temporarily laid off during her extended maternity leave, but she was the first of the laid-off employees to be recalled to work. At that time, she was no longer supervised by Walden or Flowers. She remained on the job for about nine months thereafter, when she went on PRN status, at her own request. She apparently remained on PRN status, at least technically, for some time thereafter, although she testified that she had probably been "deactivated" at the time of her deposition, as she had not been called to work for over 30 days. As the plaintiff did not resign, but actually returned to work for DGH for many months after her temporary layoff, her constructive discharge claim fails.

## D.    Retaliation Claim

The plaintiff claims that the defendants retaliated against her by counseling her for charting errors and absenteeism and by temporarily laying her off after her lawyer sent DGH a letter complaining of alleged illegal discrimination. The Eleventh Circuit has summarized the law of Title VII retaliation as follows:

> To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events. See Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994). We previously have noted that the causal link requirement under Title VII must be construed broadly; "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." E.E.O.C. v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993). Once the prima facie case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action. The plaintiff bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct. See Meeks, 15 F.3d at 1021.

35

Olmsted v. Taco Bell Corp. 141 F.3d 1457, 1460 (11th Cir. 1998) (citing Meeks, 15 F.3d at 1021).[25]

The statutorily protected expression is the plaintiff's complaint, via her lawyer's letter, about the alleged discrimination she had suffered at the hands of the defendants. DGH became aware of the statutorily protected conduct, on or about January 22, 1996, the date of a letter sent by the plaintiff's attorney stating her concerns and complaints. After that date, the plaintiff alleges that she continued to receive repeated reproofs and counseling about her charting errors and that she was temporarily laid off.

The defendants argue that the plaintiff did not suffer from any adverse employment action after the attorney's letter was sent. To the extent that she did suffer from any adverse employment action, the defendants argue, they were not causally related to any protected conduct of the plaintiff but were based upon legitimate, non-retaliatory reasons, which are set forth in the Title VII pretext discussion above.

Even assuming that the plaintiff's temporary layoff and the admonishments about her charting errors and absences were all adverse employment actions, the plaintiff does not state a case of retaliation because she has not shown a causal relation between the alleged adverse employment actions and her protected conduct. See Meeks v. Computer Associates Intern., 15 F.3d 1013, 1021 (11th Cir. 1994). The plaintiff fails to show that she was treated any differently from other employees who did not threaten legal action over alleged discrimination.

_____

[25]ADA retaliation claims are assessed under the same framework employed for the analysis of Title VII retaliation claims. Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir. 1997).

36

The evidence does not show that she was treated differently from other nurses with respect to her charting errors. The evidence does not show that she was treated differently from other employees with recurring attendance problems. She was counseled about charting errors on an ongoing basis before and after the date of her lawyer's letter. She was suspended twice for absenteeism in 1995, before the date of her lawyer's letter, pursuant to a neutral policy of progressive discipline. Likewise, the plaintiff's temporary layoff was clearly part of a hospital-wide staff reduction, pursuant to which other employees on extended medical leave were temporarily laid off. There is no evidence that DGH treated employees who did not threaten legal action were treated any differently for the purposes of the temporary layoff.

In addition, too much time passed between the date of the lawyer's letter and the temporary layoff seven months later to allow an inference of causation. Other courts have found that such a lapse precludes an inference of causation. As one court found:

> Although Stokes did acknowledge receiving from Plaintiffs' counsel a June 1994 letter complaining of her client's treatment under the Rehabilitation Act and threatening legal action, this Court cannot infer causation given the seven-month lapse between that June 1994 letter and the January 1995 duty cancellation. See Valdez v. Mercy Hosp., 961 F.2d 1401, 1403 (8th Cir. 1992)[superseded by statute on other grounds] (no retaliation found where six months passed between protected activity and termination); Reeves v. Digital Equip. Corp., 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action); Brown v. ASD Computing Ctr., 519 F. Supp. 1096, 1116-17 (S.D. Ohio 1981) (discharge four months after protected activity too remote).

Rio v. Runyon, 972 F. Supp. 1446, 1460 (S.D. Fla. 1997). See also Walton v. Cowin Equipment Co., Inc., 774 F. Supp. 1343, 1348 (N.D. Ala. 1991), aff'd, 974 F.2d 1348 (11th Cir. 1991) (no prima facie case where defendant did not fire plaintiff or reduce her pay after she filed EEOC charge and did not chastise her for filing it, but only transferred her for a

legitimate reason after a considerable lapse of time). Due to the lapse of time between the

date of the lawyer's letter and the plaintiff's temporary layoff, any retaliation claim based upon

the layoff must therefore fail.[26]

## E. Outrage

The plaintiff also claims that the defendants committed the state law tort of outrage

against her. She makes claims against DGH for the actions of its supervising agent, Walden

and against Walden individually. She alleges that

> Walden intentionally inflicted emotional distress upon the plaintiff by subjecting
> her to abusive, harmful, hurtful conduct while the plaintiff was attempting to
> carry out her duties associated with her employment. Defendant Walden
> disciplined the plaintiff, made frequent comments to the plaintiff, attempted to
> subject the plaintiff to psychological treatment and ultimately effectively
> terminated the plaintiff because of her disability and/or pregnancy.

Complaint at ¶ 23. The plaintiff further alleges that "Defendant Decatur General Hospital

authorized or ratified and/or condoned its agent's conduct. . . ."

In Brassfield v. Jack McLendon Furniture, Inc., 953 F. Supp. 1424 (M.D. Ala. 1996),

the court stated:

> The Supreme Court of Alabama recognized the tort of outrage in American
> Road Service Co. v. Inmon, 394 So. 2d 361 (Ala. 1980). Under the tort of
> outrage, liability is imposed for 'unprivileged, intentional or reckless conduct of
> an extreme and outrageous nature, and only that which causes severe emotional
> distress.' Id. at 365. The court emphasized the severity of the conduct required
> to support an outrage claim: 'conduct so outrageous in character and so extreme
> in degree as to go beyond all possible bounds of decency, and to be regarded as
> atrocious and utterly intolerable in a civilized society.' Id.

---

[26]It is thus unnecessary for the court to determine whether any of the allegedly
retaliatory acts against the plaintiff constitute adverse employment actions.

To establish the tort of outrage, the plaintiff must prove three elements: '(1) the actor intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from his conduct;  (2) the conduct was extreme and outrageous; and (3) the distress was severe.'  Moore v. Spiller Associated Furniture, Inc., 598 So. 2d 835 (Ala. 1992) (quoting Perkins v. Dean, 570 So. 2d 1217, 1219 (Ala. 1990)).

The Supreme Court of Alabama summarized the exceedingly narrow scope of the tort as follows:

> [T]he tort of outrage is a very limited cause of action that is available only in the most egregious circumstances.  As a consequence, this court has held in a large majority of the outrage cases reviewed that no jury question was presented. . . . In fact, in the 12 years since Inmon was decided, all cases in which this court has found a jury question on an outrage claim have fallen within only three categories:  1) cases having to do with wrongful conduct in the context of family burials . . . 2) a case where insurance agents employed heavy handed, barbaric means in attempting to coerce the insured into settling an insurance claim . . . 3) a case involving egregious sexual harassment.

Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1044 (Ala.1993).  Brassfield, 953

F. Supp. at 1452-1453; see also Kilgore v. Thompson & Brock Management, Inc., 93 F.3d

752, 754 (11th Cir. 1996) (the tort of outrage applies only "in the most egregious

circumstances.").

In this case, the plaintiff has alleged a number of wrongs that she has suffered at the

hands of the defendants.  She alleges that Walden disciplined her for absences, some of which

were due to prolonged infections from which she allegedly could not quickly recover because

of her spherocytosis and her resulting splenectomy.  She alleges that Walden forced her to go

to counseling through the EAP and that Walden picked on her by counseling her repeatedly for

charting errors.  She also alleges that she was required to attend a counseling session with

Walden and three of her superiors in which she was chastened and berated.  The plaintiff

implies that her agitation during that counseling session caused her to go into premature labor. She alleges that, during some of her counseling sessions, Walden made comments such as "your pregnancy is no excuse [for performance problems]," and "I'm going to fire you the next time I see you." (Plaintiff's Deposition at 208, 239). The plaintiff alleges that Walden said there was "always something wrong" with her and that Walden once said there was "something mentally wrong" with her. She complains that she was temporarily laid off while she was on maternity leave. Although the evidence shows that Walden was not involved in the layoff decision, the court will consider that action as the basis of the outrage claim as well.

None of the conduct of which the plaintiff complains even approaches the level required to state a claim of outrage under Alabama law. Although the evidence might arguably satisfy the first element of the tort, since Walden probably knew or should have known that her conduct would cause the plaintiff some level of emotional distress, the evidence would not satisfy the second element of the tort, which requires that the conduct be "extreme and outrageous." Moore, 598 So. 2d 835, 836. To meet this element, Walden's conduct must have been "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." None of the alleged conduct is even arguably this offensive. If all the plaintiff's allegations are to be believed, Walden may have, at times, been unprofessional and overbearing toward the plaintiff. She may indeed have been impatient, unpleasant and even derisive. Although this conduct and the temporary layoff may have truly upset and worried the plaintiff, it is simply not the sort of conduct the tort of outrage was designed to remedy. At best, the complained-of conduct in this case constitutes "mere insults, indignities, threats,

40

annoyances, petty oppressions, or other trivialities," which the Alabama courts have held do

not support a claim of outrage. Inmon, 394 So. 2d at 365.

## F.   Invasion of Privacy

"Alabama recognizes the tort of invasion of privacy, having adopted what is essentially

the Restatement (Second) of Torts § 652B. That section provides in pertinent part, 'one who

intentionally intrudes physically or otherwise upon the solitude or seclusion of another or his

private affairs or concerns, is subject to liability to the other for invasion of privacy, if the

intrusion would be highly offensive to a reasonable person.'" Martin v. Norfolk S. Ry. Co.,

926 F. Supp. 1044, 1052. In examining an invasion of privacy claim, the court must

determine whether the defendant wrongfully intruded into an individual's private activities "in

such a manner so as to outrage or cause mental suffering, shame or humiliation to a person of

ordinary sensibilities." Brassfield, 953 F. Supp. at 1456.

The Alabama Supreme Court in Hogin v. Cottingham, 533 So. 2d 525 (Ala. 1988),

further defined what constitutes a wrongful invasion:

> [T]here must be something in the nature of prying or intrusion and the intrusion
> must be something which would be offensive or objectionable to a reasonable
> person. The thing into which there is intrusion or prying must be, and be
> entitled to be, private. Two primary factors are considered in determining
> whether or not an intrusion which effects access to private information is
> actionable. The first is the means used. The second is the defendant's purpose
> for obtaining the information.

Id. at 531 (citations and internal quotations omitted).

The plaintiff complains that her privacy was invaded by "[t]he nature and frequency of

the comments to which the plaintiff was subjected by defendant Walden concerning plaintiff's

pregnancy." (Complaint at ¶ 28). The plaintiff complains that Walden said that there was

41

something "mentally wrong" with her during a discussion about her pregnancy-related concerns. (Plaintiff's Responsive Submission in Response to Motion for Summary Judgment at 26). The plaintiff complains that these comments intruded upon her "private affairs and psychological integrity." (Id.). As a result, she claims that she experienced stress and has painful memories of her pregnancy. She complains that she was robbed of "a sense of security about who I was and my job," and that "some of the joy was taken out of actually being pregnant." (Plaintiff's Deposition at 24-25).

Even assuming that Walden did make comments such as "your pregnancy is no excuse," and "there's something mentally wrong with you," and "there's always something wrong with you," and even if she told the plaintiff not to discuss her pregnancy while she was working, this would not be enough to sustain an invasion of privacy claim based upon an alleged intrusion upon the solitude or seclusion of another or his private affairs or concerns. The plaintiff has not shown that the defendants wrongfully intruded into her private activities "in such a manner so as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Brassfield, 953 F. Supp. at 1456. In fact, it appears that the defendants were far more enlightened about the plaintiff's private affairs than they wanted to be. Walden and Flowers both counseled the plaintiff about discussing her pregnancy excessively while on the job after their superior, Lorraine McCormick twice noticed her doing so and asked them to correct her.

In addition, the complained-of conduct does not approach the intrusive nature of the conduct previously deemed to support an invasion of privacy claim under Alabama law. For example, several Alabama cases have found that extreme, outrageous sexual harassment can

42

support an invasion of privacy claim.  See Busby v. Truswal Systems Corp., 551 So. 2d 322

(Ala. 1989) (employer invaded his employees' privacy by repeatedly asking questions and

making remarks concerning their sex lives); Phillips v. Smalley Maintenance Services, 435 So.

2d 705 (Ala. 1983) (employer questioned a female employee several times a week for three

months behind locked doors about the employee's sexual experiences and later made coercive

sexual advances toward her).  Less serious cases of harassment do not support an invasion of

privacy claim.  See McIsaac v. WZEW-FM Corp., 495 So. 2d 649, 650 (Ala. 1986)

(employer repeatedly asked a female employee to 'be available,' tried to kiss her several times

and later attempted to have her fired for resisting his advances).  See Brassfield, 953 F. Supp.

at 1456.  The conduct cited by the plaintiff is even less intrusive than that cited by the

plaintiff in McIsaac.  The evidence does not support the plaintiff's invasion of privacy claim.

### CONCLUSION

Plaintiff's evidence raises no genuine issue of material fact regarding the claims set

forth in her Complaint.  Accordingly, defendants' motion for summary judgment is due to be

granted.  An order granting defendants' motion for summary judgment will be entered

contemporaneously herewith.

DONE this 8th day of December, 1998.

John E. Ott

JOHN E. OTT
United States Magistrate Judge

43